## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| LILLIE JOHNSON, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| vs. | } | CASE NO. CV 06-B-1193-S |
| | } | |
| R & L FOODS, LLC d/b/a | } | |
| WENDY'S OLD FASHIONED | } | |
| HAMBURGERS, | } | |
| | } | |
| Defendant. | } | |

## <u>MEMORANDUM OPINION</u>

This case is currently before the court on the defendant's Motion for Summary

Judgment.  (Doc. 17.)[1]  Upon consideration of the record, the submissions of the parties,

the arguments of counsel, and the relevant law, the court is of the opinion that defendant's

Motion is due to be granted.

## I.      STATEMENT OF FACTS[2]

R&L Foods, LLC ("R&L") owns and operates several Wendy's Old Fashioned

Hamburgers ("Wendy's") restaurants in central Alabama, as well as in several other

_____

[1]  Reference to a document number, ["Doc. ___"], refers to the number assigned to
each document as it is filed in the court's record.

[2]  As required when determining a Motion for Summary Judgment, the Statement of Facts
reflects the facts in the light most favorable to Ms. Johnson, the non-moving party.  All disputed
facts are resolved in her favor and all reasonable inferences arising from those facts are drawn in
her favor. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89, 110 S. Ct. 3177, 3188-
89, 111 L. Ed. 2d 695 (1990); *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1455
(11th Cir. 1997).

states.  Lillie Johnson, an African-American female, was first hired by R&L's predecessor, Garrett-Kosin, in August of 1999.  (Def.'s Ex. 8, Johnson Depo. at 36; Def.'s Ex. 8, Ex. 3 at 13, 35.)   Plaintiff started out in management training at the Cahaba Valley store.  (Def.'s Ex. 8, Johnson Depo. at 41.)

Each R&L store has several different levels of management positions.  (Def.'s Ex. 2, Westerfield Aff. at 2, ¶ 2a.)  Each store has a General Manager ("GM") who oversees store operations and supervises the other management employees in that particular store. *Id*.  In addition, each store generally has a Store Manager, and one or more Assistant Managers, who oversee the crew members,  run the shifts, and help the GM operate the store.  *Id*.  The GM for each store reports to a District Manager ("DM"), who oversees a certain number of stores and, in turn, the DM reports to the Director of Operations ("DO").  *Id*.  At all times relevant to this action, David Westerfield was the DO.  *Id*. Store Managers and Assistant Managers have the same authority over other employees, however the Store Manager may be given more responsibility with regard to handling certain paperwork.  *Id*.

When plaintiff completed management training, she was assigned to the Wildwood store as Assistant Manager, where she worked for about a year and a half under supervisor Mike Winningham.  (Def.'s Ex. 8, Johnson Depo. at 41-42.)  Plaintiff was then transferred to the Store Manager position in the Mountain Brook store, where she reported directly to Tammi Harper, then General Manager of that store.  *Id*. at 42-43.

2

After about a year as Store Manager at Mountain Brook, she was  promoted to General Manager at the Riverchase store.  *Id*. at 44-45. Plaintiff continued to report directly to Tami Harper, who had been promoted to District Manager.  (Def.'s Ex. 8, Johnson Depo. at 45; Def.'s Ex. 8, Ex. 4 at 2, Ex. 5 at 2.)

Under R&L's Progressive Discipline policy, tardiness, absenteeism, and poor job performance are all grounds for discipline.  (Def.'s Ex. 8, Johnson Depo., Ex. 3 at 15, Ex. 8 at 15.)  Upon the first occurrence of unacceptable conduct by an employee, the policy dictates that the employee receive counseling from her manager regarding the unacceptable conduct, as well as the potential consequences for future occurrences.  *Id*. at 15-16.  For additional occurrences within six months of an oral warning, the manager is required to issue two written warnings prior to terminating the employee.  *Id*. at 16. General Managers have the authority to hire, discipline, and terminate crew members, and to discipline Managers and Assistant Managers, however termination of Managers and Assistant Managers is subject to the veto of the District Manager, the Director of Operations, or the Human Resources Manager.  (Def.'s Ex. 1, Real Aff. at 2, ¶ 3a(2).) R&L provides its managers with a form, called a Corrective Action Notice, on which they are to document disciplinary counseling and further written warnings in accordance with R&L's Progressive Discipline policy.  (*See* Ex. 8, Johnson Depo., Exs. 4, 5, 9, 11, 17, 18; Def.'s Ex. 7, Alwine Depo., Exs. 3, 4.)

While she was the General Manager at Riverchase, plaintiff was disciplined for poor performance by her District Manager, Tammi Harper.  (Def.'s Ex. 8, Johnson Depo. at 45).  Eventually, Harper transferred plaintiff to the General Manager position at the Valley Avenue store, a lower volume store.  *Id*.  Plaintiff received two written warnings while working as General Manager at Valley Avenue, both from Tammi Harper. Plaintiff's first written warning, dated April 21, 2003, was for "starting to slack" in several aspects of her duties regarding the store's daily deposits.  (Def.'s Ex. 8, Johnson Depo., Ex. 4.)  The second written warning from Harper, dated April 28, 2003, was for a 135 hour overage in labor; "the standard for labor weekly is no more than 20 hours over the guide."  *Id*., Ex. 5.  On the second Corrective Action Notice, Harper noted that plaintiff had received several verbal warnings about labor hour overages.  *Id* at 1.  On July 28, 2003, Harper terminated plaintiff's employment because of further performance problems.  (Def.'s Ex. 8, Johnson Depo. at 53; Def.'s Ex. 8, Ex. 12.)

In December 2003, R&L acquired the assets of Garrett-Kosin, and took over as owner and operator of its Wendy's stores.  (Def.'s Ex. 6, Westerfield Depo. at 8.)  In January 2004, plaintiff was re-hired and assigned to the Trussville store for management training.  (Def.'s Ex. 8, Johnson Depo. at 54, 58.)  When she completed training, plaintiff took a position as Store Manager of the Eastwood Wendy's.  *Id*. at 61.  At that time, the General Manager of the Eastwood store was Cedrick Crawford, a black male; the District Manager over the Eastwood store was Mike Winningham, a white male.  *Id*. at 61-62, 67-

4

68.  Crawfod issued plaintiff two written disciplinary warnings while she worked at his store, both on May 25, 2004.  (Ex. 8, Johnson Depo., Exs. 9, 10.)  The first Notice states that plaintiff was not getting along with the crew, that she had been "getting in [his] face telling [him] she will do this and that," that she had threatened to hit him, and that her attitude was very bad for the store.  (Def.'s Ex. 8, Johnson Depo., Ex. 9 at 1-2.)  The second Notice states that Johnson called Crawford a "bitch," that she told crew members that she was going to make sandwiches slowly on purpose, and that she refused to cover her position.  *Id*., Ex. 10 at 1-2.  The Notice also stated that plaintiff has inappropriate conduct all the time, and that she does not operate as a manager should.  *Id*. at 2  Plaintiff signed both Notices and below her signature on the second Notice, she wrote: "Both myself and Cedrick was very unprofessional toward each other."  *Id*.  Plaintiff testified that she reported the incident between herself and Crawford to Human Resources Manager, Gary Real, and that she requested a transfer.  (Def.'s Ex. 8, Johnson Depo. at 68.)  Plaintiff was transferred to the Store Manager position in Trussville, where she stayed until she took maternity leave in September 2004.  *Id*. at 70.  She was disciplined by her General Manager at Trussville for leaving a cash register drawer unattended and unlocked, which resulted in money being stolen from the drawer.  *Id*. at 71-72.

When plaintiff returned from maternity leave in mid-October 2004, she was placed at the Wildwood store as Store Manager, where April Armstrong was the General Manager.  (Def.'s Ex. 8, Johnson Depo. at 74-75.)  Armstrong was soon replaced as GM

by Mike Alwine, who issued a written warning to plaintiff on December 1, 2004 for being an hour and ten minutes late for her shift.  (Def.'s Ex. 8, Johnson Depo., Ex. 11.)  Alwine noted that this was the second time that plaintiff had arrived extremely late for work, which was completely unacceptable for a manager, as the managers are supposed to set the example for the crew.  *Id.* at 1-2.  Alwine also noted that this incident would be reported to David Westerfield, Director of Operations, and that future occurrences could result in suspension without pay, or even termination.  *Id.* at 2.  The plaintiff refused to sign the Notice. (*Id.* at 2; Def.'s Ex. 8, Johnson Depo. at 76.)

Sometime in the summer of 2005, plaintiff was asked to help out at the Bessemer Superhighway store for a few weeks.  *Id.* at 80-82.  She claims that she was offered the General Manager position at that store, but that she declined the offer because she knew that the store was about to close.  *Id.*  Dave Westerfield testified that plaintiff was interviewed by Tony Brown, District Manager for the Bessemer Superhighway store, but denies that plaintiff was ever offered the GM position at that store.  (Def.'s Ex. 6, Westerfield Depo. at 25-26, 38.)

While plaintiff was temporarily working at the Bessemer Superhighway store, Mike Alwine was transferred to the GM position at Riverchase, which created an opening at Wildwood for a new GM.  *Id.* at 27-27.  When plaintiff returned to Wildwood from Bessemer, she learned that Dennis Mason, a white male, had been chosen by Westerfield to fill the open GM position.  (Def.'s Ex. 8, Johnson Depo. at 84.)  Plaintiff was very

upset that she was not promoted to GM at Wildwood, because she felt that Westerfield had promised her that the next General Manager position to become available would be hers. *Id*. at 88-89, 91.  She also testified that both Westerfield and Alwine told her that she would become the GM at Wildwood when Alwine left. *Id*. at 142, 145.  However, plaintiff also claims that Alwine made several statements to white employees, never directly to her, indicating that she would not get the position because "they" would never make an African-American GM of that particular store. *Id*. at 140-144.  Plaintiff says she complained to Westerfield that it was not fair that a white man got the GM spot after she was tricked into going to Bessemer, and that Westerfield responded that "it's a done deal," and told her to "suck it up." *Id*. at 93-95.  Westerfield does not recall any discussion with plaintiff regarding her potential for advancement in the company in general, or the GM position at Wildwood in particular.  (Def.'s Ex. 6, Westerfield Depo. at 22-23, 33.)

According to Westerfield, the criteria for filling a General Manager position varies depending on the type of store.  (Def.'s Ex. 6, Westerfield Depo. at 19.)  For GM positions at high volume and training stores,[3] the Director of Operations will generally obtain input from District Managers as to potential candidates, and will consider each candidate's management experience, past job performance, knowledge of R&L procedures, and ability to get along with others.  (Def.'s Ex. 2, Westerfield Aff. at 2c.)

---

[3] A training store is a store certified by Wendy's International to train new management level employees.

Wildwood is a high volume store, as well as a training store.  *Id*. at 4b.  After a meeting

with the district managers to discuss candidates, Westerfield selected Dennis Mason to

fill the GM position at Wildwood because:

> he alone among the possible candidates had several years of General Manager
> experience at another Wendy's restaurant in the Birmingham area which was
> operated by a different Franchisee; He also displayed excellent communication
> skills, good procedural knowledge, and worked extremely well with the crew
> employees when he was a management employee at R&L's Riverchase store
> before I made him the GM at Wildwood.

(Def.'s Ex 2, Westerfield Aff. at 5, ¶ 4e.)  Westerfield considered but rejected Johnson

because of her poor communication skills, difficulty getting along with other employees,

past performance, and because she had previously been discharged for her poor

performance as a GM at a low volume store.  (*Id*. at 5, ¶ 4g; Def.'s Ex. 6, Westerfield

Depo. at 32.)  Westerfield says that the forgoing is reflected by the Corrective Action

Notice forms in plaintiffs personnel file.  (Def.'s Ex. 8, Johnson Depo., Exs. 4, 5, 9, 10,

11.)  Westerfield also stated that plaintiff scored less than 60% on her operations test,

which is designed to test a manager's knowledge of R&L's procedures; the required score

is 90%.  (Def.'s Ex. 2, Westerfield Aff. at 5-6, ¶ 4g.)  According to Westerfield, neither

race nor sex played any role in his decision to select Mason rather than Johnson as the

new GM at Wildwood.  *Id*. at 6, ¶ 4h.

Plaintiff did not get along well with Dennis Mason, the new GM at Wildwood.

(Def.'s Ex. 8, Johnson Depo. at 92.)  Mason says that she refused to communicate with

him and otherwise displayed a negative attitude toward him from the first day he started working at the Wildwood store.  (Def.'s Ex. 16, Mason Aff. at 4, ¶ 4b.)  He believed that she was acting that way because she was upset that she was not chosen for the GM position.  *Id.*  On September 29, 2005, the day before Hurricane Katrina hit the southeast, Johnson and Mason had an altercation.  Their stories diverge as to the facts surrounding the incident.  However, it appears to have originated due to a shortage found in the bank while plaintiff was closing the store that evening with Assistant Manager Catawba Brown.  Plaintiff apparently became angry upon finding out that Mason took $40.00 from the bank, which caused a shortage.  She claims that, after receiving a phone call about the situation, Mason returned to the store intoxicated.  (Def.'s Ex. 8, Johnson Depo. at 101-102.)  Plaintiff says that Mason took her into his office, closed the door, and backed her against the wall.  *Id.* at 110.  She claims that he cussed at her, beat his hands on the desk, and accused her of not being a team player.  *Id.* at 11.  Catawba Brown was present when Mason came back to return the $40.00, but did not hear Mason raise his voice to Johnson.  (Def.'s Ex. 9, Brown Depo. at 17.)

Mason says that on September 29, 2005, after notifying Catawba Brown of his intention to do so, he borrowed $40.00 from petty cash to put gas in his car so that he could pick up items for the store and go by R&L's corporate office before the storm hit.  (Def.'s Ex. 16, Mason Aff. at 5, ¶ 3a-b.)  When he was off duty later that night, he received a call from Johnson or Brown, he can't remember which, regarding a $20.00

cash shortage in Johnson's drawer which had occurred a few days earlier,[4] and the $40.00 he had taken from the safe. *Id*. at ¶ 3b.  He says that he tried to explain to Johnson that she was only responsible for the $20.00 shortage from her drawer and that he had the $40.00 from the safe. *Id*.  Because she refused to listen, Mason decided to go to the store and attempt to resolve the situation. *Id*.  When he arrived, he returned the $40.00 to the safe, and tried to discuss the situation with Johnson, but he says that she was angry and would not listen to him. *Id*. at ¶ 3c.  Mason claims that he had had one beer. *Id*. at ¶ 3b.

Plaintiff reported this incident to Gary Real, the Human Resources Manager, the next morning. (Def.'s Ex. 8, Johnson Depo. at 111.)  Real spoke with Mason, Johnson, and Brown about the incident, and determined that:  Mason had taken $40.00 from the safe to buy gas so he could pick up items for the store; once he was off-duty, Mason returned home and had one beer because he had no reason to expect he would be returning to the store; Johnson called Mason to return to the store the night of August 29, 2005 to discuss the shortage; Mason did return to the store to return the $40.00 and to discuss the remaining shortage with Johnson; the remaining shortage of $20.00 originated when Johnson closed the store on Saturday, August 27, 2005; Mason was not intoxicated

---

[4] On Saturday, August 27, 2005, as the closing manager, Johnson completed a Daily Deposit Verification form, and indicated zero variance in the closing bank, meaning that there was no shortage. (Def.'s Ex. 8, Ex. 14.)  Plaintiff did not work the next day, but the Daily Deposit Verification form for August 28, 2005 shows that the opening manager reported a negative $20.00 variance in the bank; the closing manager also reported that the bank was $20.00 short at closing. *Id*., Ex. 15.  When Assistant Manager Catawba Brown opened the store on Monday, August 29, 2005, there was still a $20.00 shortage. *Id*. at 16.

when he return to the store.  (Def.'s Ex. 1, Real Aff. at 4-5, ¶ 4b.)  Real determined that, under the circumstances, Mason did not act improperly in returning to the store. *Id*.  Real decided not to discipline Johnson or Mason because he felt that the situation had been blown out of proportion.  (Def.'s Ex. 5, Real Depo. at 16, 20.)

Soon after the September 29, 2005 incident, Westerfield transferred plaintiff to the Assistant Manager position at the Riverchase store because Johnson and Mason were having difficulty getting along.  (Def.'s Ex. 6, Westerfield Depo. at 34.)  Mike Alwine was the GM at Riverchase at the time.  (Def.'s Ex. 8, Johnson Depo. at 115.)  Plaintiff's salary stayed the same, but she says that she complained to Westerfield about the transfer because the Riverchase store was fifteen minutes from her home, while it took her only five minutes to get to the Wildwood store.  *Id*. at 122, 206-207.  Plaintiff admits that she was late to work "many, many times," and that she was disciplined repeatedly by Alwine for tardiness.  *Id*. at 116.  However, plaintiff was under the impression that, because Riverchase was farther from her home than Wildwood, she had Westerfield's permission to be late.  *Id*. at 122.  She even claims that Alwine was aware of the alleged "understanding," to make an exception for her in terms of tardiness.  *Id*. at 169-170.  Neither Westerfield, nor Alwine recall any such "understanding."  (Def.'s Ex. 6, Westerfield Depo. at 41; Def.'s Ex. 7, Alwine Depo. at 29-30.)

On September 26, 2005, plaintiff filed a charge with the Equal Opportunity Employment Commission ("EEOC") alleging that she did not receive a promised

promotion to GM of the Wildwood store, and that she was involuntarily transferred for discriminatory reasons based on her race and her gender.  (Def.'s Ex. 8, Johnson Depo., Ex. 19.)  The charge was mailed to the Wildwood store instead of the corporate office, and it is unclear exactly when Westerfield, Real, and Alwine became aware that plaintiff had filed this charge.  (Def.'s Ex. 5, Real Depo. at 29; Def.'s Ex. 6, Westerfield Depo. at 55; Def.'s Ex. 7, Alwine Depo. at 59, 68.)

On September 27, 2005, Alwine issued plaintiff a written warning regarding her repeated tardiness.  (Def.'s Ex. 8, Johnson Depo., Ex. 17.)  That day, Johnson had been an hour and twenty-three minutes late.  *Id*.  She missed the weekly manager's meeting, which started at 3:00 p.m., and was 23 minutes late for her shift, which started at 4:00 p.m.  *Id*.  Alwine noted that plaintiff had received a written warning from him in 2004 regarding tardiness, and that he had verbally counseled her about reporting late for work two to three other times before, most recently on September 20, 2005.  *Id*.  The Notice states that "[t]his is Lillie's final warning!  Any further occurrences will result in termination.  This has been discussed with Dave Westerfied, [Director of Operations]."  *Id*. at 2.  Alwine noted that plaintiff refused to sign in acknowledgment of the Notice.  *Id*.

Plaintiff says that she understood the September 27, 2005 warning to be a final warning and that she was facing termination if she was late for work again.  (Def.'s Ex. 8, Johnson Depo. at 118; 122-24.)  However, she says that she thought that an exception would be made because of the "understanding" between herself and Westerfield

12

regarding tardiness.  *Id*.  On October 6, 2005, Johnson was scheduled to open the store,

but was late again, and the other employees could not get into the store.  *Id*. at 119.  At

around 7:25 or 7:30, plaintiff had still not arrived, and crew members called Alwine, who

was not scheduled to work that day, to come to the store to let them in.  (Def.'s Ex. 7,

Alwine Depo. at 25-26.)  It is unclear from the record whether Alwine or plaintiff arrived

first and let the employees into the store.[5]

Because she had been late, causing the other employees to clock in late, Johnson

changed the opening employees' time to reflect that they all arrived at 7:00 a.m.  (Def.'s

Ex. 8, Johnson Depo. at 120-21.)  Later that day, Alwine prepared a written warning

regarding plaintiff's tardiness.  (Def,'s Ex. 8, Ex. 18.)   He noted that plaintiff had

admitted that she was later to work because she tore her pants.  *Id*. at 1.  Alwine stated

that, due to the fact that he was not there, the written warning was "for documentation

purposes only."  *Id*. at 2.  However, he noted that "as stated on her previous warning, the

next time will result in termination as was previously discussed with Lillie and Dave

Westerfield."  *Id*.  Alwine indicated that plaintiff refused to sign the Notice because he

never got a chance to go over it with her.  (Def.'s Ex. 7, Alwine Depo. at 37-38.)  Alwine

_____

[5]  Alwine testified that he arrived before plaintiff and let the employees in on October 6, 2005.  (Def.'s Ex. 7, Alwine Depo. at 61-62, 80.)  However, on the Corrective Action Notice for October 6, Alwine indicated that he had not been there that morning.  (*See* Def.'s Ex. 8, Ex. 18.) Plaintiff testified that the employees were waiting outside the store when she arrived on the morning of October 6, 2005, and that she let them in.  (Def.'s Ex. 8, Johnson Depo. at 119.)  She also says that she was unaware that the crew members had called Alwine, or anyone else, to let them in.  *Id*.  Johnson's testimony is consistent with Alwine's notation on the disciplinary form, that he was not there when she arrived to open the store on October 6, 2005.

says that she left the store after her shift, instead of coming to speak with him as he had asked her to do. *Id*. At the bottom of the second page of the Corrective Action Notice, there is a notation that "Lillie changed all employee openers times to 7 AM because they were here when she got here." (Def.'s Ex. 8, Johnson Depo., Ex. 18, at 2.)

Johnson was late for work again the next day, on October 7, 2006, and Alwine wrote her up again. (Def.'s Ex. 7, Alwine Depo., Ex. 3.) Alwine noted that Johnson's shift started at 7:00 a.m. but that she arrived at 7:15 a.m. *Id*. at 1. He indicated that plaintiff refused to sign, and that she stated that "if we want to terminated [sic] her, her lawyer would be in touch with Dave." *Id*. at 2. According to Alwine, he prepared this Corrective Action Notice, and spoke with plaintiff about it, as soon as she arrived that morning. (Def.'s Ex. 7, Alwine Depo. at 47-48.) At 8:40 that morning, Alwine printed and reviewed the employee time sheets for the previous day, as was his normal practice. *Id*. at 73. He says that he noticed that the clock-in time for all of the opening employees had been changed to 7:00 a.m., which he decided to investigate because he knew they had all been locked out until at least 7:25 or 7:30. *Id*. Alwine spoke to each employee whose time had been altered, including Tywanne Barrow, Vanesta Windsor, John Williams, and LaDerrick Sanders. (*Id*. at 52; Def.'s Ex. 7, Alwine Depo., Ex. 4, at 3.) Williams and Sanders admitted that they had actually arrived twenty to thirty minutes late the day before. *Id*. at 53-54. Sanders recalls, on at least one occasion, Alwine asking him and other employees what time they had arrived on a day when Johnson had been late opening the store. (Def.'s Ex. 14, Sanders Declaration, at unnumbered 1-2, ¶ 5.)

14

As Assistant Manager, plaintiff had the authority to change a crew employee's time if he or she forgot to clock in or out, or to otherwise correct an employee's time to accurately reflect the time the employee worked.  (Def.'s Ex. 1, Real Aff. at 3, ¶ 3b(1)(b); Def.'s Ex. 5, Real Depo. at 39.)  However, changing an employee's time to reflect that an employee worked hours that he or she did not actually work is considered falsifying company records, a serious infraction which is grounds for immediate termination. (Def.'s Ex. 1, Real Aff. at 3, ¶ 3b(2)(a); Def.'s Ex. 5, Real Depo., Ex.4, at 14.)  After concluding his inquiry, Alwine called Westerfield to discuss the situation.  (Def.'s Ex. 7, Alwine Depo. at 51; 56-57.)  He told Westerfield about plaintiff's repeated tardiness, and that Johnson had changed the times to cover up the fact that she had been late again the day before. (Def.'s Ex. 6, Westerfield Depo. at 46-47.) Westerfield told Alwine that it sounded like an incident of falsifying company records, but that Alwine needed to talk to Gary Real to make sure.  (*Id*. at 53; Def.'s Ex. 7, Alwine Depo. at 51; 56-57.)  Alwine called Gary Real and explained the situation, including plaintiff's final warning for tardiness, and that she had attempted to cover up her tardiness the day before by changing the crew members' time to 7:00 a.m., regardless of what time they actually arrived. (Def.'s Ex. 5, Real Depo. at 32.)  Real determined that Alwine had reason to conclude that Johnson had falsified a company document, and did not veto the decision to terminate her employment.  (Def.'s Ex. 1, Real Aff. at 6, ¶ 5d.)  At some point on October 7, 2005, Alwine completed a second Corrective Action Notice for plaintiff for falsifying time records.  (Def.'s Ex. 7, Alwine Depo., Ex. 4.)  He noted that, "[o]n 10/6/05 Lillie reported

to work late, and then went into the computer and changed Twanne Barrow, Vanesta Windsor, John Williams, and LaDerrick Sanders' times to 7 a.m." *Id*. at 1-2.  The action to be taken was termination.  *Id*. at 1, 2.

Plaintiff claims that every manager changes employees' times, and that she was not treated fairly.  (Def.'s Ex. 8, Johnson Depo. at 164. 166.)  Plaintiff says that she could not have changed the other employees' clock-in times for October 6, 2005 in an attempt to cover up her tardiness; even Alwine concedes that plaintiff never denied that she was late on October 6, 2005.  (Def.'s Ex. 7, Alwine Depo. at 38-39.)  Furthermore, plaintiff claims that Alwine did not first learn of the alterations to employee times the morning of October 7, 2005.  Rather, she claims she told him on October 6, 2005 that she changed the times and that he responded: "All right Lillie.  Good job."  *Id*. at 125.  In fact, there is a notation on the Corrective Action Notice dated October 6, 2005, that Johnson had changed the times.  (Def.'s Ex. 8, Johnson Depo., Ex. 18.)  However, Alwine insists that he made that notation the next day after he found out about the altered times.  (Def.'s Ex. 7, Alwine Depo. at 40-41; 73.)  He says that, since he never got the opportunity to go over the October 6, 2005 Notice with Johnson, when he found out about the changed times, he ended up just starting over with a new Corrective Action Notice to document the altered records separately from the October 6, 2005 tardy.  (*Id*. at 41-43; Def.'s Ex. 7, Ex. 4.)

On October 13, 2005, plaintiff filed a second EEOC charge alleging that she had been disciplined and ultimately terminated because of her race and her sex, and in retaliation for complaining to Westerfield about being denied the promotion, and for

filing an EEOC claim.  (Def.'s Ex. 8, Ex. 20.)  In her Charge of Discrimination, plaintiff also alleges that, on October 3, 2005, Alwine called her a "bitch."  *Id*.  Plaintiff timely filed this action against her former employer within 90 days of receiving a Right-to-Sue letter from the EEOC.  (Doc. 1, Amended Compl.)  Plaintiff alleges that R&L refused to promote her to General Manager and, ultimately terminated her based on her race and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.,* and 42 U.S.C. § 1981.  *Id*.  Plaintiff also alleges that she was disciplined and ultimately discharged in retaliation for making an internal complaint about discrimination to Dave Westerfield, and for filing an EEOC Charge.  *Id*.  R&L has moved for summary judgment on all of plaintiff's claims.

## II.    SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress &*

*Co.*, 398 U.S. 144, 157 (1970).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof.  *Celotex,* 477 U.S. at 322-23.

Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show either by affidavits, depositions, or discovery responses on file that there exist "specific facts showing that there is a genuine issue for trial," *Celotex*, 477 U.S. at 324.  The nonmoving party need not present evidence in a form necessary for admission at trial, however he may not merely rest on his pleadings.  *Id.*  "[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial." *Clark*, 929 F.2d at 608.  After a properly made motion has been presented and the court has allowed appropriate responses to be submitted, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).

## III.    RACE AND SEX DISCRIMINATION

Section 703(a) sets out Title VII's core anti-discrimination provision.  It states: "It shall be an unlawful employment practice for an employer–to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . "  42 U.S.C. § 2000e-2(a).  In

order to demonstrate that she was the target of race and/or sex discrimination due to disparate treatment in violation of Title VII and Section 1981, plaintiff must first establish a prima facie showing of discriminatory intent. *Reeves v. Sanderson Plumbing Products, Inc.*, 120 U.S. 133, 143 (2000) (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). That is, she must establish that her race and/or sex "actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." *Hazen*, 507 U.S. at 610. The plaintiff may establish a *prima facie* case in one of at least two ways: by providing direct evidence in the form of remarks or statements made by the defendant or one of its agents; or by relying on circumstantial evidence. *See United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715-716 (1983); *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 805 (1973). Plaintiff has not presented direct evidence of discrimination.

Absent direct evidence, a plaintiff may prove intentional discrimination through circumstantial evidence under the familiar *McDonnell Douglas* paradigm. The elements required to establish a prima facie case of disparate treatment under this rubric vary slightly depending on the type of adverse employment action alleged. Once a prima facie case is established, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to produce "legitimate, non-discriminatory reasons for its employment action." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir.1997) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). If the employer meets this burden of production, the presumption of

discrimination falls away, and the plaintiff bears the ultimate burden of proving that the employer's proffered explanation is pretext for unlawful discrimination. See *Holifield*, 115 F.3d at 1565 n.21. "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves,* 120 U.S. at 143 (quoting *Burdine*, 450 U.S. at 253).

A.     ***Promotion Claims***

To establish a prima facie promotion claim, plaintiff must show that: "(1) [s]he is a member of a protected class; (2) [s]he applied for and was qualified for the promotion; (3) [s]he was rejected in spite of [her] qualifications; and (4) the employer promoted an individual outside of the plaintiff's protected class, or else continued to attempt to fill the position." *Johnson v. Bd. of Trustee*s, 191 Fed. Appx. 838, 843 (11th Cir. 2006). It is undisputed that, as a black female, plaintiff is a member of a protected class, that she did not receive the promotion at issue, and that R&L promoted an individual outside of plaintiff's protected class, a white male. Defendant contends that plaintiff has not established a prima facie case because she cannot show that she was qualified for the GM position at the Wildwood store. (Doc. 18, Def.'s Brief in Support, at 16.) For the purposes of summary judgment however, the evidence is sufficient to establish a prima facie case of discrimination on plaintiff's promotion claims.

Alwine offered plaintiff's name, among others, to Westerfield as a potential candidate for the job. ((Def.'s Ex. 7, Alwine Depo. at 13.) He also testified that plaintiff

20

"was definitely ready to be a GM," although he was afraid that, if Johnson was made GM at Wildwood, the crew would "walk out and quit" because they did not like working for her. *Id*. at 15-16.  Furthermore, Westerfield stated that he "tossed plaintiff's name out" as a candidate for the GM position at Wildwood, but ultimately did not chose her.  (Def.'s Ex. 6, Westerfield Depo. at 31-32.)  The fact that plaintiff was considered for the GM position is sufficient, at the summary judgment stage, to establish that she was qualified for the promotion.  Therefore, she has established a prima facie promotion case.

Once a prima facie case is established, the defendant must proffer legitimate, non-discriminatory reasons for the employment decision at issue. *McDonnell Douglas*, 411 U.S. at 802.  If such reasons are identified, the burden shifts back to the plaintiff, who then bears the ultimate burden of proving that the defendant's proffered reasons are pretext for discrimination. *Burdine*, 450 U.S. at 253.  At this stage, the employer need not prove that it was actually motivated by the proffered reason.  Rather, an employer "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id*.  R&L has met its burden by offering admissible evidence which, if believed, is sufficient to support a conclusion that the plaintiff was not promoted to GM because of her poor communication skills, difficulty getting along with other employees, her previous discharge for poor performance as GM at a low volume store, and because she did not have the required level of knowledge of R&L procedures.  Additionally, R&L has offered evidence that Mason was selected because he had a great deal more experience as

a GM, he displayed excellent communication skills, good procedural knowledge, and he worked very well with crew employees. Because R&L has met its burden of producing legitimate, nondiscriminatory reasons for selecting Mason over Johnson for the GM position, the presumption of discrimination falls away, and the burden shifts back to plaintiff to establish that R&L's articulated reasons were pretext for unlawful discrimination. *Saint Mary's Honor Center v. Hicks*, 509 U.S. 502, 516 (1993).

To raise a genuine issue of fact, plaintiff must offer evidence from which a reasonable jury could infer that R&L's proffered explanation is false, <u>and</u> that plaintiff's race and/or sex was the true reason that she did not receive the promotion to GM. *Saint Mary's Honor Center v. Hicks*, 509 U.S. 502, 516 (1993).  If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment. *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir.1997)).

Johnson contends that she has produced circumstantial evidence of racial bias in the form of statements made by Mike Alwine while he was GM at Wildwood.  She claims that she overheard Alwine make statements to other employees that: "they weren't going to put another black person in [the GM] position [at Wildwood];" and "[s]he'll never get this store.  They're not going to put a black person in this store, maybe, Bessemer store." (Def.'s Ex. 8, Johnson Depo. at 137; 141-44.)  Even assuming that these statements are not hearsay, they are nevertheless irrelevant because Westerfield, not Alwine, was the

22

decisionmaker as to the Wildwood GM position.  Although Alwine offered names of three employees, including Johnson, to Westerfield as candidates for the GM position, he did not participate in the meeting Westerfield held with the District Managers to discuss candidates for the position, and it is undisputed that Westerfield made the ultimate decision.  (Def.'s Ex 7, Alwine Depo. at 13-14; Def.'s Ex. 6, Westerfield Depo. at 28-32.) The statement cannot be attributed to Westerfield, and Alwine did not participate in the decision not to promote plaintiff to the Wildwood GM position.  Therefore, Alwine's alleged statements have little, if any, probative value as circumstantial evidence of discriminatory animus.

Moreover, evidence of discriminatory animus does not allow a plaintiff to establish pretext without directly rebutting each of the employer's proffered reasons for its decision.  *Crawford v. City of Fairburn, Georgia*, 483 F.3d 1305, 1308 (11th Cir. 2007). Plaintiff has not offered evidence which directly rebuts ***any*** of R&L's proffered reasons for its decision not to promote her to GM at the Wildwood store.  Rather, her own testimony establishes the truth of each of Westerfield's articulated reasons for selecting Mason over plaintiff for the position. Plaintiff admits that, during her first tenure with Wendy's, she received several verbal warnings, and two written disciplinary Notices, from Tammi Harper, an African-American District Manager, and that she was ultimately terminated for poor performance.  (Def.'s Ex. 8, Johnson Depo. at 46-47, 48-49.)  She also admits that she was unable to get along with her GM at the Eastwood store, Cedrick Crawford, an African-American.  *Id.* at 66-67.  Crawford, issued two Corrective Action

23

Notices to plaintiff for failure to get along with the crew, bad attitude, and other inappropriate managerial behavior including threatening to hit Crawford and calling him a "bitch," and telling co-workers that she was going to make sandwiches slowly on purpose. (*Id*. at 63; Def.'s Ex. 8, Johnson Depo., Exs. 9, 10.)  Plaintiff admits that she had to be transferred from Eastwood to Trussville because of her inability to get along with Crawford, and admits that she was disciplined by the GM at Trussville for leaving a register unattended, resulting in money being stolen from the drawer.  (Def.'s Ex. 8, Johnson Depo. at 71-72.)  She says she was also disciplined "several times" while she was in Trussville for coming to work late.  *Id*. at 72-73.  Plaintiff admits that on December 1, 2004 she was written up by her GM for missing a manager's meeting and arriving for work one hour and ten minutes late to work.  *Id*. at 76.  Plaintiff also testified that she had no knowledge as to Dennis Mason's experience, qualifications, history, references, or whether he had ever been disciplined, and has offered no evidence to prove that he was not more qualified for the GM position than she.  *Id*. at 86-87.  By failing to rebut each of R&L's stated legitimate, nondiscriminatory reasons plaintiff has failed to raise a genuine issue of material fact about whether those reasons were pretext for discrimination based on her race and/or sex.  Therefore, defendant's Motion for Summary Judgment is due to be granted as to plaintiff's promotion claims.

**B.**   **_Discharge_**

To establish a prima facie case of race-based or sex-based discharge, plaintiff must show that: (1) she is a member of a protected classification; (2) she was subjected to an

adverse job action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job. *Knight v. Baptist Hospital of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003). Defendant contends that plaintiff cannot establish the third element of her prima facie case. The court agrees.

The Eleventh Circuit has stated:

In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed. We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.

*Maniccia*, 171 F.3d at 1368. Plaintiff claims that all managers and shift managers "change" employees' time, but admits that she knows of no employee who was retained after being caught "falsifying" employees' time, i.e., changing employees time so it reflects a time other than the time the employee actually worked. (Def.'s Ex. 8, Johnson Depo. at 165.) Plaintiff also admits that she does not know whether Mike Alwine, Gary Real, or Dave Westerfield have been involved in, or have knowledge of, any other situation in which another employee was accused of falsification of employee time records. *Id*. at 167-68. Because plaintiff has not identified any similarly situated white or male comparator who falsified employee time records, but was treated more favorably, she has failed to establish a prima facie case for unlawful discharge based on her race and/or sex in violation of Section of 1981 and Title VII. Therefore, defendant's Motion

25

for Summary Judgment is due to be granted as to plaintiff's discriminatory discharge claim.

## IV.   RETALIATION

"Title VII's anti-retaliation provision forbids actions by an employer that 'discriminate against' an employee because she has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.' "  *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S.Ct. 2405, 2410 (2006); 42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation under this provision, plaintiff must show that (1) she engaged in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there was some causal relation between the two events.  *Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999).

Plaintiff contends that her ultimate termination, and the three written disciplinary warnings she received between September 27, 2005, and October 7, 2005, were in retaliation for engaging in conduct protected under Title VII.  Plaintiff engaged in protected activity including making an informal internal complaint regarding discrimination to Westerfield, and filling a Charge of Discrimination with the EEOC. Defendant contends that plaintiff has failed to establish the third element of a prima facie retaliation case.   First, defendant argues that plaintiff has not shown that the relevant decisionmaker was aware of plaintiff's protected activity at the time that the challenged employment actions were taken.  Defendant contends therefore, that plaintiff is also

unable to establish the necessary causation between plaintiff's protected activity, and the adverse employment actions.

In order to establish causation the plaintiff must, at a minimum, make the threshold showing that the decisionmaker was aware of the protected activity. *Beard v. 84 Lumber Co.*, 206 Fed.Appx. 852, 895 (11th Cir. 2006). Plaintiff first engaged in protected activity immediately after Dennis Mason became the new GM at Wildwood, in August 2005. (Def.'s Ex. 8, Johnson Depo. at 93; Def.'s Ex. 16, Mason Aff. at unnumbered 1, ¶ 1.) Plaintiff says that she complained to Westerfield that it was not fair that a white man had been selected to fill that position. (Def.'s Ex. 8, Johnson Depo. at 93.) There is no evidence that anyone other than Westerfield was aware that plaintiff made this complaint.

Plaintiff signed the first of two EEOC Charges of Discrimination on September 26, 2005. (Def.'s Ex. 8, Johnson Depo., Ex. 19.) The Charge was originally received at the Wildwood store, instead of R&L's Corporate Office. *Id*. at 181. It is unclear exactly when the Charge was received at Wildwood, and when and how it made its way to the Corporate Office. However, there is no evidence that the Charge was received at Wildwood prior to October 7, 2005. Dave Westerfield does not remember when or how he found out about the EEOC Charge. (Def.'s Ex. 6, Westerfield Depo. at 55.) Gary Real does not recall when he became aware of the Charge, but he testified that he learned of it before Mike Alwine called him on October 7, 2005 to discuss terminating Johnson. (Def.'s Ex. 5, Real Depo. at 29.) Alwine says that he doesn't remember exactly when he found out about the EEOC Charge, but that it was after he terminated plaintiff. *Id*. at 59.

27

However, Gary Real testified that he mentioned the Charge to Alwine at the end of their conversation about terminating the plaintiff, after the decision had been made.  (Def.'s Ex. 5, Real Depo. at 29.)

A.   *Discipline*

Plaintiff contends that the counseling and written warnings she received on September 27, 2005, October 6, 2005, and October 7, 2005, for repeatedly being late to work were motivated by retaliatory animus.  (Def.'s Ex. 8, Johnson Depo., Exs. 17, 18; Def.'s Ex. 7, Alwine Depo., Exs. 3, 4.).  Defendant does not dispute that plaintiff is able to establish the first two elements of a prima facie discipline case.[6]  In order to establish the final element, causation, plaintiff must, as a threshold matter, demonstrate that the decisionmaker was aware that she had engaged in protected activity when he issued the challenged discipline.  *Beard*, 206 Fed.Appx. at 895.  R&L contends that plaintiff's prima facie case fails because she cannot show that Mike Alwine knew of plaintiff's protected

---

[6]  It is undisputed that plaintiff engaged in activity protected by Title VII.  As to whether plaintiff has satisfied the second element of her prima facie case, defendant does not argue that the challenged discipline does not constitute an adverse employment action.  (*See* Doc. 18, Def.'s Br. in Support at 24-25.)  Because the court finds that the Motion for Summary Judgment as to plaintiff's retaliation claim is due to be granted on other grounds, it is not necessary to evaluate whether the discipline plaintiff received rises to the level of adverse employment action.  *See Burlington Northern and Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2414-15 (2006) ("The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. . . . [A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.") (internal quotations and citations omitted).

activity when he disciplined plaintiff for tardiness on September 27, October 6, and

October 7, 2005.[7]

There is no evidence that Alwine was aware of plaintiff's internal complaint to

Weseterfield.  However, plaintiff contends that she has produced evidence that, at the

time he disciplined plaintiff, Alwine knew that she had filed a Charge with the EEOC.

Plaintiff relies principally on an alleged statement Alwine made to plaintiff, in which he

made reference to a lawyer.  Plaintiff testified that, one morning when she was coming

into the office at Riverchase, Alwine asked her: "Lillie, you got you a lawyer?"  (Def.'s

Ex. 8, Johnson Depo. at 191.)  Plaintiff does not recall when Alwine made this statement,

except that it was after she had been written up for the first time, on September 27, 2005,

and after she filed her first Charge with the EEOC, on September 26, 2005.  *Id*. at 191-92.

She says that Alwine did not specifically mention the EEOC.  *Id*. at 191.

On summary judgment, the court is required to view all facts in the light most

favorable to the plaintiff, the non-moving party, and to draw all ***reasonable*** inferences in

her favor.  *See e.g., Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir. 2000).

However, even taking plaintiff's testimony as true, to infer from it that Alwine had actual

knowledge of plaintiff's EEOC Charge, requires an inferential jump larger than the court

is required to make.  Alwine's statement alone, without context, a definite time frame, or

---

[7]  Although there is some evidence that Alwine consulted Westerfield regarding some of
the write-ups he issued to plaintiff,  the parties appear to agree that Alwine was the sole
decisionmaker with regard to the challenged disciplines.

any reference to an EEOC Charge or any other protected activity, is insufficient to support a ***reasonable*** inference that Alwine knew that plaintiff had filed an EEOC Charge.

None of the other evidence upon which plaintiff relies to show that Alwine was aware of plaintiff's protected activity is relevant to her discipline claim, as each incident occurred *after* Alwine made the decision to discipline plaintiff for tardiness the final time, at 7:15 a.m. on October 7, 2005.  The court will discuss plaintiff's additional evidence below, in its analysis of plaintiff's retaliatory discharge claim.

Even assuming, however, that plaintiff could establish a prima facie case of retaliatory discipline,[8] she has not adduced sufficient evidence of pretext.  Defendant has proffered a legitimate, non-discriminatory reason for the challenged discipline: tardiness.  Accordingly, the plaintiff bears the ultimate burden of offering evidence from which a reasonable jury could find that defendant's proffered explanation is in fact false, and that retaliation was the actual reason for the discipline.  *Saint Mary's Honor Center v. Hicks*, 509 U.S. 502, 516 (1993).

R&L's Corporate Policy includes a section entitled "Guidelines – Unacceptable Conduct."  (Def.'s Ex. 8, Johnson Depo., Exs. 3, 8 at 15.)  Included as an example of

---

[8] Plaintiff contends that she has met the causation element of a prima facie case based on the proximity in time between her informal complaint to Westerfield, the filing of her first EEOC Charge, the write-ups, and her termination.  However, establishing causation, for the purposes of a prima facie retaliation case, is dependent on the threshold showing that the decisionmaker had knowledge that the plaintiff engaged in protected activity.  Because the court finds that plaintiff has failed to offer evidence on which a reasonable juror could find that Alwine had knowledge of plaintiff's protected activity, plaintiff has not established causation.

unacceptable conduct, which requires the use of progressive discipline, is tardiness which is defined as "[a]rriving for work more than ten (10) minutes after the scheduled time." *Id*. Each of the three reprimands plaintiff received between the time she filed her first EEOC Charge, and the time of her termination, were for violating this policy. (Def.'s Ex. 8, Johnson Depo., Exs. 17, 18; Def.'s Ex. 7, Alwine Depo., Ex. 3.) The Eleventh Circuit has held that, when a defendant offers as its legitimate, non-discriminatory reason plaintiff's violation of a "work rule," plaintiff may establish pretext by adducing evidence (1) that she did not violate the work rule, or (2) that if she did violate the work rule, other employees outside of the protected class, who engaged in similar acts, were not similarly treated. *Damon v. Fleming Supermarkets of Florida*, 196 F.3d 1354, 1363 (11th Cir. 1999). Plaintiff has admitted that she violated R&L's rule on tardiness on each of the days she was disciplined for doing so. (Def.'s Ex. 8, Johnson Depo. at 116-19.) Moreover, plaintiff has not offered a single example of another employee who had not engaged in protected activity, had a similar record of tardiness, and who was treated more favorably.

Instead, plaintiff relies on evidence of the alleged "understanding" between herself, Westerfield, and Alwine. (Doc. 22, Pl.'s Br. in Opposition at 22 n. 6.) She contends that the fact that she was disciplined despite the alleged "understanding" is evidence that defendant's articulated reason for the discipline is false. *Id*. Plaintiff

explained the "understanding" as follows:

> Q.    Now, in your complaint you claim you were retaliated against; can you tell me how you think you were retaliated against?
>
> A.    Yes ma'am.  As far as Dave [Westerfield] and I, and Mike Alwine having an understanding that I would come out there to Riverchase, although I didn't want to go.  I would be running late trying to get to and from there – well, to get to there in between.  The store is out a piece further, the distance.  But we had an understanding, but instead, I get wrote up even though I called and let you know I'm running late, what have you, and I still get wrote up and next time, termination.  It was a constant thing, but we made an understanding, we had an understanding from the beginning.
>
> * * *
>
> Q.    So basically, you feel like you were retaliated against because you were disciplined; is that right?
>
> A.    Yes, ma'am.

*Id*. at 168-70.  In her Brief, plaintiff contends that "Westerfield had told the plaintiff and Alwine that it did not matter if she was late," and that "it was alright if she was late as long as she got there when she could."  (Doc. 22, Pl. Br. at 3-4, ¶¶ 29, 30.)  However, the evidence does not support this allegation.  First, it is apparent from plaintiff's testimony that neither Alwine, nor Westerfield explicitly stated that she would not be subject to discipline if she arrived late to work.  She testified:

> Q.    And you understood at this point that if you were late, you would be terminated; correct?
>
> A.    No, ma'am.
>
> Q.    That's not what the Counseling Form . . . that's not what you understood from the September 27, 2005 Counseling Form?

A.     No ma'am.  Understood from coming from Wildwood to Riverchase, by Dave Westerfield himself, "I know it's going to be hard for you to get out there Lillie, just get there."

I didn't want to go to Riverchase.  The distance way out of my reach.  So I got there the best way that I could.  And they understood – well I thought they understood.

\* \* \*

Q.     What I'm hearing you say is that you thought that Dave [Westerfield] would make an exception [regarding tardiness]?

A.     That's what Dave told me.  He didn't care as long as I show up and suck it up about the incident that took place.  He was just trying to get me from working with Dennis [Mason].  They did not care how I got to work as long as I got there and shut my mouth about Wildwood.

(Def.'s Ex. 8, Johnson Depo. at 122-24.)  Plaintiff further testified:

Q.     Okay.  Now, during that conversation [with Alwine, and Westerfield], did they say that it was okay for you to be late and they weren't going to discipline you for it?

A.     Yes, ma'am, pretty much.

Q.     Tell me what that conversation was.

A.     Mike [Alwine] said, "As long as you show up. . . "

Q.     When he said, "show up," did he mean late?

A.     He meant show up whenever you show up, I'm out the door, and he's gone.

Q.     Is that was you *interpreted* that to mean?

A.     Yes.  But see, I didn't

A.     . . . His exact words was "That's fine, just as just as long as you get here."

Q.     So he said, "As long as you show up," or "As long as you get here, that's

fine?"

A.     His exact words were, "As long as you get here."

Q.     And did he say anything else?

A.     No.

Q.     Okay.  Do you know if he meant when he said, "as long as you get here," did he mean on time?

A.     No, ma'am.  He did not.

Q.     How do you know that?

A.     Because we had an understanding that the distance of trying to get there would be a problem for me to come to Riverchase that was further on down the road than Wildwood, and I didn't want to work that far out.

         * * *

Q.     So your understanding, based on this conversation, that it was okay for you to be late?

A.     Yes, ma'am.

*Id*. at 170-72.  Plaintiff never testified that Alwine or Westerfield explicitly told her that she would not be subject to discipline for being late to work.  Westerfield and/or Alwine told her "just get there," and she interpreted that to mean that she could be late.  *Id*. Plaintiff's testimony about the alleged "understanding" may be sufficient to support a conclusion that plaintiff genuinely believed that she was not required to report to work on time.  However, in light of all the evidence, it is not sufficient to support a reasonable inference that plaintiff was in fact exempted from the R&L policy regarding tardiness.

34

Westerfield testified that he was aware of plaintiff's problem with tardiness, and that he and Alwine had discussed the fact that Alwine had disciplined her for being late to work on more than one occasion. (Def.'s Ex. 6, Westerfield Depo. at 39-41.)  While plaintiff was at the Riverchase store, Westerfield personally counseled her over the telephone about constantly being late to work.  *Id*. at 41.  Furthermore, on each of the Corrective Action Notices Alwine issued to plaintiff, Alwine specifically noted that the problem and potential consequences of further occurrences had been discussed with Westerfield.  (Def.'s Ex. 8, Johnson Depo, Ex. 17 at 2, Ex.18 at 2; Def.'s Ex. 7, Alwine Depo., Ex. 3 at 2.)  On the Corrective Action Notice dated September 27, 2005, Alwine noted that this was Johnson's final warning about being late, that any future occurrences would result in termination, and that "[t]his has been discussed with Dave Westerfield." (Def.'s Ex. 8, Johnson Depo., Ex. 17 at 2.)

Under the circumstances, it would not be reasonable to infer that plaintiff was in fact exempt from R&L's policy on tardiness.  Her subjective belief that she could be late to work without consequences is insufficient to establish pretext.  Moreover, even assuming that there was such an agreement at one time, plaintiff testified that Alwine told her as early as September 20, 2005, before she filed her EEOC Charge, that he would continue to write her up for being late.  (Def.'s Ex. 8, Johnson Depo. at 175, 178.) Plaintiff's contention that she was disciplined for being late despite the alleged "understanding" she had with Westerfield, and Alwine is insufficient to establish that the reason given by Alwine for disciplining plaintiff on September 27, 2005, October 6,

35

2005, and October 7, 2005, that being plaintiff's tardiness, was false, and that the true reason was retaliation.  Therefore, defendant's Motion for Summary Judgment is due to be granted as to plaintiff's retaliatory discipline claim.

> **B.**   *Discharge*

Defendant contends that plaintiffs prima facie case for retaliatory discharge also fails because she is unable to show that Alwine was aware that she had engaged in protected activity when he first contemplated her termination.   Plaintiff disagrees, arguing that she has presented evidence from which a fact-finder could reasonably conclude that Alwine was aware of plaintiff's protected activity before he decided that he needed to terminate her.  Plaintiff also contends that the ultimate decisionmaker was Gary Real, who admits that he was aware of plaintiff's EEOC Charge at the time of his October 7, 2005 discussion with Alwine regarding her termination.

Alwine and Real both testified that Alwine had already decided that he wanted to terminate Johnson before he called Westerfield and Real.  (Def.'s Ex. 7, Alwine Depo. at 81; Def.'s Ex. 5, Real Depo. at 32.)  Alwine says he had even completed the majority of the Corrective Action Notice documenting plaintiff's termination prior to speaking with either Westerfield or Real.  (Def.'s Ex. 7, Alwine Depo. at 51.)  The court finds there is insufficient evidence from which a reasonable jury could conclude that the decision to terminate Johnson was influenced by anyone who had knowledge of plaintiff's protected activity.

Pursuant to R&L's Corporate Policy, Alwine did not have authority to terminate a management employee without first obtaining the approval of the District Manager, the Director of Operations, or the Human Resources Manager.  (Def.'s Ex. 1, Real Aff. at 2, ¶ 3a(2); Def.'s Ex. 2, Westerfield Aff. at 2, ¶ 2a(2); Def.'s Ex. 3, Alwine Aff. at 2, ¶ 2a(2).) Alwine testified that he called Westerfield and Real the morning of October 7, 2005 because "[he] wanted to make sure that he was within [his] guidelines," (Def.'s Ex. 7, Alwine Depo. at 81-82.)  He says that he spoke with Westerfield briefly, and that Westerfield told him that "more than likely, we should fire her, but to talk to Gary [Real] to make sure."  *Id*.[9]  Alwine testified that, after he explained the circumstances, Real told him that plaintiff's conduct "does fall under falsifying company documents and that [he] could terminate her, that [he] needed to terminate her."  (Def.'s Ex. 7, Alwine Depo. at 57.)  Real's testimony reflects that he did not influence, but simply ratified Alwine's decision to terminate the plaintiff.  Real testified:

> Q:     . . . When you found out that Ms. Johnson had filed this charge of discrimination, did you discuss it with anybody other than counsel at – any body employed with R&L foods?
>
> A:     Ever?
>
> Q:     Let's say prior to Ms. Johnson's termination.
>
> A:     When Mike called me to discuss Lillie's termination at some point during the conversation after we had determined we were going to let her go, you

---

[9] Westerfield testified: "When Mike came to me, and said, you know ranting and raving on the phone, and I just asked him if he had all his documentation and he said he did and I said good, go to human resources and see Gary, follow up with him."  (Def.'s Ex. 6, Westerfield Depo. at 53.)

know, I – I said oh, by the way she filed a discrimination charge against us also.

. . .

Q:   What did you and Mike discuss?  Tell me about the discussion.  When it was determined to terminate Ms. Johnson?

A:   Mike stated that she had been late on numerous occasions previously, that he had written her up.  She was on a final written warning and that she had shown up late one more time.  And he – I believe he stated that he had – he told me he had originally written her up and planned to just warn her, but the more he thought about it, the angrier he got and he was just done with her.  I think is pretty much what he said.  **And he wanted to let her go.** And I mean he stated that she had been late to work, the she had entered everyone's time in an attempt to cover up the fact that she was late.  She had entered everybody else's time at 7:00 regardless of what time the had actually arrived.  **And I said fine, let her go.**

(Def.'s Ex. 5, Real Depo. at 30-32.)

As discussed above, the court finds Alwine's alleged comments regarding the plaintiff having a lawyer, which for summary judgment purposes, the court accepts as true, are insufficient to impute to Alwine knowledge of plaintiff's protected activity.  The plaintiff has not offered evidence on which a reasonable jury could find that Alwine knew of plaintiff's protected activity at the time he recommended her termination.  Because plaintiff has not offered evidence on which a reasonable jury could find that Alwine, the decisionmaker, was aware of plaintiff's protected activity when he sought approval for plaintiff's termination, plaintiff has failed to offer evidence on which a reasonable jury could find a causal relation between plaintiff's protected activity and her discharge.

38

Therefore, defendant is entitled to judgment as a matter of law on plaintiff's claim of retaliatory discharge.

## V.    CONCLUSION

Based on the forgoing, the court finds that R&L's Motion for Summary Judgment (doc. 17) is due to be granted.  An Order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this the 3rd day of March, 2008.


*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE